## Farley *v.* Blood *& a.*

A bill of interpleader is the proper remedy for one who holds property in which he has no interest but as a mere trustee, where there is so much uncertainty as to which of the parties claiming it adversely is entitled, that the trustee cannot decide in favor of either, without reasonable ground for apprehending a suit in favor of the opposing claimant.

The plaintiff ought, in such case, to accompany his bill with an affidavit that the suit is not brought by collusion with either party defendant.

Where land is the object of the controversy, the plaintiff ought to make conveyances of the same, ready for delivery to each of the claimants; and if he have not done so at the filing of the bill, and in the bill offered to deliver the deed to the party who shall be decreed to be entitled, the court will order such deeds to be made and filed with the clerk, subject to further order.

If, upon the bill and answers, it appear that the plaintiff has the right to require the defendants to interplead, a decree will be made accordingly; and if sufficient appear upon the pleadings to enable the court to adjudge between the defendants, they will proceed to do so. But if not, they will direct an action or suit to be brought, or an issue to be framed and sent to the court of common pleas for trial, or a reference to a master to report the facts.

Where one buys real estate with his own money, and causes the conveyance to be made to another, who thereupon gives a bond to convey the same, on request, to the wife of the purchaser, a trust results *prima facie* to the wife, upon the presumption that the husband intended the purchase as an advancement to her. But that presumption may be repelled by evidence showing that he intended to limit her interest in the land to the term of her own life; and then the trust results, on her death, to the husband, if no conveyance have in the mean time been made.

The trustee will, in such case, be required to convey the estate to the husband surviving; and the heirs of the wife are not entitled to it.

In a bill of interpleader, if a case for interpleading be made, the plaintiff will, if he have conducted properly, be, in general, entitled to costs to the time of the decree requiring the parties to interplead.

The defendant, who has by his wrongful claim occasioned the suit to be brought will, ordinarily, be required to pay the costs of the other defendant and the costs of the complainant.

In equity. The bill states that the plaintiff made his bond, dated May 15, 1835, for $800, with condition to convey to Rebecca Blood, deceased, wife of Henry M. Blood, upon payment of $124,12 within a year, certain real estate called the Quaid place, bought by him, partly with money of

Henry and partly with money of Rebecca. The two occupied the premises during the life of Rebecca, and the sum of $124,12, before named, was paid according to the condition.

Rebecca Blood afterwards died, leaving no issue nor parent. Her heirs are William Read, Winslow Read, Roxana Read, Warner Read, brothers and sisters of the deceased, and the representatives of Betsey Peirce, late wife of Daniel Peirce of Hollis, to wit: Daniel Warner Pierce, Susan E. P., wife of William H. Pearson, Mary R., wife of Charles Hamblett, Myrrick, otherwise called Merrick S. Peirce, and William R. Pierce, all of whom, together with Henry Blood, are made defendants.

That Henry Blood, the husband, claims the land, and has demanded that a conveyance thereof be made to him.

That the heirs of Rebecca, above named, object, and as such, claim that the land shall be conveyed to them by the plaintiffs.

That the land was paid for in the following manner: Two hundred and twenty-seven dollars by money derived from the sale of personal and real property of Henry M. Blood, and one hundred and twenty-four dollars and twelve cents, with the interest from May 15, 1835, by the labor of Henry and Rebecca for the orator, which sum was paid within the year, as agreed in the condition of the bond.

That the orator is advised that the defendants ought to interplead together touching the estate and their respective rights to a conveyance, that the orator may know to whom it ought to be made. The bill prays process, and that the defendants may answer and be ordered to interplead.

The answer of Henry M. Blood admits the seizin of the plaintiff and the writing obligatory, with condition to convey the land to Rebecca Blood, as set forth in the bill, the payment of the two several sums of $227 and $124,12, as stated in the bill, and the sources whence those sums were derived. That they were both the money of the defendant,

and together formed the entire consideration for the conveyance of the land, and that the last-named sum, namely, $124,12, was paid within the year limited by the condition of the bond.

The writing obligatory was made to Rebecca, with the assent of the defendant, Henry M. Blood, and that before her death neither of them ever requested that a conveyance of the property might be made, but the plaintiff held the land in trust for persons to whom it belonged, till her decease on August 11, 1850.

That the heirs are the persons named as such in the bill, and that the occupancy of the premises was as is therein stated, and that the defendant has requested that a deed he made to him.

The answer avers that Rebecca was not present at the time of executing the bond, and for a long time did not know of it. That the plaintiff felt an interest in the welfare of said Rebecca, and desired to secure to her a house during life, and in case the defendant should be unfortunate. That he, confiding in the plaintiff as a man learned in the law, and wishing to gratify his desire to secure and provide a homestead for Rebecca, in case of his own misfortune, the defendant assented to the arrangement.

That it was not his intention nor that of said Farley that, in case he survived, the premises should descend to the heirs of his wife, the other defendants. That on or about the 4th day of November, 1838, said Farley, by obligation, agreed to convey to the defendant and wife, or the survivor of them, another tract of land.

That the arrangement, made on the 15th day of May, 1835, was not made on account of or in consideration of money of Rebecca, which the defendant had received, or of money received from her father's estate, or from her own personal earnings. That she had not, at her marriage, any personal property which came to the defendant. That although he received of Wilder Read $25 for a debt due to

Rebecca, and $130 of the administrator of her father's estate, yet the value of the Quaid place is much greater than all sums received by him by reason of the marriage.

That the sum of $227 was not reserved by the plaintiff to replace any money received by the defendant by reason of the marriage, and there was no agreement between the defendant and Farley, or between the defendant and Rebecca, and no understanding to that effect, or that the title was to vest in her, for the purpose of restoring the said sum of $227, or any other property supposed to have been received by the defendant by reason of the marriage.

That since coming into possession the defendant has expended over $350, in enlarging and remodelling the buildings upon it.

That the defendant bargained with Mr. Emerson for the Quaid place, and that Farley, by agreement with the defendant, took the conveyance, and had in his hands, of the money of defendant, enough to pay for it, except $124,12, and it never was the intention of the defendant that said Rebecca should have any interest in it beyond her life. That after he had taken possession, and Rebecca became discontented, the defendant may casually have said to her that the premises were obtained for her, or that the Quaid place belonged to her, but never meaning to give her, or any other person to understand that said Rebecca had any other interest in the premises than a homestead for life, or to give any one to understand that the defendant waived, abandoned, or had given up his claim to said premises.

That the defendant, at all times after the marriage, during the life of Rebecca, took care of and provided for her, keeping money to be used by her at discretion.

The joint and several answer of Warren Read, William Read, Winslow Read, Roxana Read, Wilder Read, Daniel W. Peirce, Merrick S. Peirce, heirs of Rebecca Blood, admits the plaintiff's seizin of the Quaid place, his obligation to convey it, his holding it in trust, and the receipt by him

of the money named in the condition of the bond, but whether from Henry M. Blood or of Rebecca, the defendants have no knowledge or means of knowledge. It admits the occupany as stated, the decease of Rebecca Blood, that they are her heirs, and claim and have requested the plaintiff to convey to them, each his respective portion, of the estate in question.

These parties, by their answer, aver that Henry M. Blood or Rebecca Blood received large sums of money, due to her at the time of their marriage, and by descent to her, among which were about $70 or $80, owed to her before marriage by the defendant, William Read; about $145, supposed to have been paid to her on a debt from the defendant, Winslow Read. Also a sum between $15 and $25, paid to her on a debt due to her by the defendant Wilder Read, before her marriage, and about $230, as they believe, received by Henry M. or by her, from her father's estate.

Also, that she had at or prior to said marriage, two cows and other personal property, and that all those sums of money and all that personal property came to the use of Henry M. Blood, as the defendants believe.

That said Rebecca, before the marriage, worked for said Henry M. Blood from five to eight years, for which service he agreed to pay her one dollar per week, and that all, or nearly all her wages for that time were due to her at the time of marriage. That since the marriage she has worked for the plaintiff a number of years. And the defendants say that, as they believe and have been informed, the sum of $227, mentioned in the bill as money left in the hands of said Farley, from the sale of Henry M. Blood's property, was so left in his hands, by the consent of said Henry, to replace part of the money which he had appropriated, belonging to her.

They further answer that they have good cause to believe, and do believe, that the bond, by the consent of Henry, was given to Rebecca instead of him, with the full intent of

vesting the title of the Quaid place in her, restoring to her $227, and so much of the other property and money belonging to her at the time of her marriage, and descended to her, as would be sufficient to pay the remainder of the purchase money. Among which reasons are the following: Said Farley, at or about the time of the date of said bond, gave one or more bonds to said Henry, conditioned to convey to him certain other real estate, as these defendants are informed and believe; that said Rebecca always said that the Quaid place was her own, and always had the custody of the bond, and requested her brothers to keep it for her.

They further answer that Roxana, Winslow and Warner, three of these defendants, as they aver, and as the other defendants believe, have often heard said Henry say that the Quaid place was Rebecca's, and that she could do what she pleased with it. And during her last sickness, and at a time prior, Henry M. Blood said in the hearing of the defendants, Winslow and Warner, as they aver, and as the other defendants believe, that he would not take care of his wife; that the Quaid place was hers, and that she might take it and take care of herself with it; and that her brothers and sisters would have the Quaid place, and they might take care of her with it. And they did provide watchers and other attendance while she was sick as aforesaid, to prevent her from suffering for the want thereof.

They claim that they are entitled to have a conveyance of the Quaid place made to them, as the heirs at law of said Rebecca Blood.

To this answer and to that of Henry M. Blood, respectively, a several replication was filed.

William H. Pearson and Susan, his wife, William R. Peirce, Charles Hamblett, jr. and Mary, his wife, served with process in the case, do not answer, and are defaulted.

The cause was based upon the bill, answers and replica-

tion, at the July term, 1854, when the following opinion of the court was pronounced.

*A. F. Stevens*, for the complainant.

*A. W. Sawyer*, for H. M. Blood.

*B. F. Emerson*, for the heirs who appeared.

Woods, J.   Upon the facts alleged in the bill and averred and admitted in the answers, it is manifest that the complainant has no interest in the subject matter of the bill, namely, the Quaid place, the premises, the right to which is in dispute.   The fact is made plain that he holds the title simply as trustee, for such person or persons as the same may be found to belong to, and claims no interest in himself, and the claims of the defendants are fully stated in the bill and in the answers.

Perhaps the complainant should have made out conveyances duly executed, purporting to convey the premises according to the several claims alleged in the bill, and should have averred the preparation and execution of them, and his readiness and an offer to deliver the same in court for the use of such of the grantees named therein as might be adjudged entitled.   If this bill were a bill filed for relief in the nature of a bill of interpleader, perhaps it might not be necessary to offer to deliver such conveyances into court. But that is not this case.   This is a simple bill of interpleader, filed only for the purpose of asking that the defendants may be ordered and decreed to litigate and settle their conflicting claims between themselves.   *Mohawk and Hudson Railroad Co.* v. *Clute & a.*, 1 Cow. 384.   No exception, however, is taken to the want of the preparation and execution of such conveyances, or to the omission of the plaintiff to allege the same in his bill.

When the party would maintain a bill of the character

of this one, he must allege and show that he is ignorant of the rights of the different claimants; or at least that there is doubt as to which of them is entitled to the fund or other matter which is the subject matter of the proceeding. It can be maintained only when the same debt or duty or other thing is claimed by two or more parties, by different and separate interests, and in which the claimant has no interest beyond that of a mere trustee or stake holder, and where, from his own showing, he cannot determine the right between the conflicting claimants, without hazard to himself. *Mohawk and Hudson Railroad Co.* v. *Clute & a.*, before cited.

The danger of injury to the complainant arising out of the opposing claims and doubtful rights of the several defendants as between themselves, is the general ground of jurisdiction in the case of a simple bill of interpleader. It must appear from the complainant's own showing, that he cannot pay the debt or render the duty or other thing to either of the parties claiming the same, without some risk of being subsequently liable for the same debt or duty to the other.

Where such doubt is raised upon the bill, the court will assume jurisdiction; but if not, the party really and justly entitled to the debt, duty, or other thing, is not to be subjected to the delay and expense of a chancery proceeding without his consent, before he shall be allowed to receive what is justly due him, and, in fact, as his only remedy and means of relief. *Atkinson* v. *Manks & a.*, 1 Cow. 691; *Bedell* v. *Hoffman & a.*, 2 Paige Rep. 199; *Mitchell* v. *Hayne*, 2 Sim. & Stu. 63; Jeremy's Eq. Jurisdiction 346; 1 Mad. Ch. Pr. 174.

It is said that the filing of bills of interpleader ought not to be favored, (*Bedell* v. *Hoffman*, before cited,) and to prevent it from being resorted to for the purpose of giving an advantage to one of the claimants over the other, the complainant is required regularly to annex to the bill, or upon

filing it, to file also an affidavit that he does not exhibit his bill by fraud or collusion with any of the claimants, but spontaneously for his own security. 1 Mad. Chan. Prac. 175; *Atkinson* v. *Manks & a.*, before cited; Jeremy's Eq. Jurisdiction 347. If no such affidavit be made, the neglect affords ground of demurrer. 1 Mad. Ch. Pr. 175, before cited. No such affidavit was filed in the present case, but as no demurrer has been filed, perhaps the objection, if it might have been taken, is now waived, or, at least, it may be too late to take it.

The material facts alleged in the bill, upon which the plaintiff relies to sustain his case for a decree of interpleader, are to be taken as confessed by those defendants who have not filed answers in the cause, and they are, in fact, admitted by the other defendants, so far as they have knowledge of them, and are not denied by any of them. The bill is to be considered as properly filed as to those who have failed to answer.

It is alleged and not denied that the complainant holds the Quaid place, in trust for the person or persons entitled to receive a deed of it. That such persons are either Henry M. Blood, one of the defendants, or the other defendants named in the bill as the heirs of Rebecca Blood, now deceased, and that the said Blood claims the title to the estate as belonging to him, while the heirs of Rebecca claim the right to have the same conveyed to them; and that the complainant has been requested by each of those claimants to convey the premises according to said several claims. That the complainant has no beneficial interest in the estate.

And we think that enough is stated in the bill, and admitted or not denied in the answers, fairly to show that the complainant cannot determine to whom the estate does belong, with that degree of certainty that will preclude the idea of all risk or danger in making the conveyance to either

Farley *v.* Blood.

of the complainants, that he would be adjudged liable to convey the title to the other.

But it would seem from several of the cases, that a party may be allowed to resort to a bill of interpleader, and to ask the court to tell him to which of several claimants of a fund or other thing in his hands, he may of right pay or deliver it, although he might be able, by great attention and caution, to make himself secure. He may secure himself by a single suit, instead of remaining liable to as many suits as there are claimants, where one payment ought to discharge him. The object of the bill is protection from an unjust litigation, in which the party has no interest. *Angell* v. *Haddam,* 15 Ves. 244; *Duke of Bolton* v. *Williams,* 3 Bro. C. C. 297; *S. C.* 2 Ves. jr. 138; 6 Johns. Ch. Rep. 199.

And the bill is equally proper, although the party is not actually sued, or is sued by one only of the opposing claimants; and although the claim of one of the defendants is actionable at law, and the other only in equity, provided several claims have been preferred against the complainant. *Richards* v. *Salter & a.,* 6 Johns. Ch. Rep. 445, and the cases there cited.

Taking this view of the facts stated in the bill and found in the case, the complainant is entitled to a decree in this court, that the bill is properly filed; that he should file with the clerk such conveyances as would be sufficient to convey the estate and title, according to the provisions of the bond, with such covenants of assurance of title as are therein expressed, to the said Henry M. Blood, as well as to the heirs at law of Rebecca Blood, named in the bill, ready to be delivered to the person or persons entitled to receive such conveyance, as the same shall be determined by such future proceedings as shall be directed by the court and found expedient in the further progress of the cause; and, further, that the defendants do interplead and litigate and settle the matter of controverted title to the Quaid place, which is shown upon the bill to exist. Indeed, this is the only de-

---
Farley *v.* Blood.
---

cree to which the complainant is entitled in such a case. *Bedell* v. *Hoffman*, 2 Paige's Rep. 199 before cited.

This decree will be as effectual as to those defendants who were duly served with process, and who have not appeared or made answer to the bill as to those who are before the court. *Hodges* v. *Smith*, 1 Cox 357 ; 1 Mad. Ch. 177. See also note to *Angell* v. *Hadden*, 13 Ves. 247, and cases there cited.

An interpleading bill is considered as putting the defendants to contest their respective claims, just as a bill by an executor or trustee to obtain the direction of the court as to the adverse claims of the different defendants, and if at the hearing the question between the defendants is ripe for decision, the court will decide it ; but if not so, will direct an action or an issue or a reference to a master, as may be best suited to the nature of the case. Such is the doctrine as laid down by Sir *William Grant*, master of the rolls, in *Angell* v. *Hadden*, 16 Ves. 202, (Sumner's ed.) ; Story's Eq. § 322. The question in *The Duke of Bolton* v. *Williams*, 3 Bro. C. C. 297, being ripe for decision, was decided in favor of one defendant against another, and the decree was affirmed afterwards upon a re-hearing.

In May, 1787, Lord *Kenyon* made a similar decree at the Rolls, in the case of *Hodges* v. *Smith*, 1 Cox 357, as stated in *Angell* v. *Hadden*, before cited. The bill, in that case, was filed by a tenant for the purpose of ascertaining to which of two different claimants he was to pay rent. One of the tenants established his title by evidence, and the other made default at the hearing. Lord *Kenyon* directed that the rent for the future be paid to the one, and granted a perpetual injunction as to the other.

The present case is certainly not ripe for decision. It is proper, then, for the court to point out and direct some course to bring the matter to a final hearing and determination as between the defendants. What is the appropriate course ?

In the case of *Angell* v. *Hadden*, already cited, the master of the rolls remarked thus: " In this case, the question not being ripe for decision, the precedent of *Aldrich* v. *Thompson* seems the proper one to follow," and the case was accordingly referred to a master to inquire and state the material facts.

The only matter before the master of the rolls was the question as to the proper mode of proceeding upon a bill of interpleader, when the question between the defendants was not ready for decision. Upon looking into the case of *Aldrich* v. *Thompson*, which is reported in 2 Bro. Ch. Rep. 149, and which was a bill of interpleader, filed by lessees against several sets of annuitants, who had distrained for rent on the plaintiff's farms, praying that they might interplead among themselves, it was in that case referred to a master to settle the priorities among the annuitants.

In *Richards* v. *Salter & a.*, 6 Johns. Ch. Rep. 445, which was a bill of interpleader, Salter, one of the defendants, answered the bill, admitting the facts stated in it, and showing a title in himself to the fund in question. The bill was taken *pro confesso* as to the other defendants. The case was brought to a hearing on bill and the answer of Salter. The chancellor there said: " The defendant, Salter, has answered and set forward his right and title to the money ; and the other defendants have not supported their claim. Upon this bill, the question of right may be decided in favor of one defendant and against another. If one defendant establishes a title, and the other makes default, the court will decree payment to the former, and perpetual injunction against the latter."

A similar decision was made in *Williams* v. *Bolton*, 1 Bro. Ch. Rep. 297, and in *Hodges* v. *Smith*, 1 Cox's Cases 357.

From the authorities, it is apparent that when, upon the bill and answer, it appears that the case is ready for decision, or the right of the case is made out, the court may, without

---
Farley *v*. Blood.
---

more, proceed to decide the cause as between the defendants; and when it is not thus ready for decision, the more common course in the English practice is, to send the matter to a master. Such also is the New York practice. But an action or an issue may be directed to determine the merits of the controversy between the defendants.

Perhaps in this State, if an action be not ordered, and there be facts in dispute, it may be the right of either party to have an issue framed, embracing the merits of the case, and to have it sent to the court below for trial by the jury, if application be seasonably made to the court for that purpose. *Marston* v. *Brackett*, 9 N. H. Rep. 336; *Tappan* v. *Evans*, 11 N. H. Rep. 311; *Dodge* v. *Griswold*, 12 N. H. Rep. 573.

In this case, the matter is already with a master, and nothing more is necessary to complete the direction to be given to the case than to direct the master to find and report the facts which may be proved before him, forming the grounds of claim on the part of the several claimants.

---

Upon the coming in of the master's report, at the present term, it appeared thereby that previously to the year 1835, B. M. Farley, Esquire, was acquainted with and particularly interested in having Rebecca Blood, the wife of Henry M. Blood, well taken care of and supported, and by means of some business transactions between Henry M. Blood and Benjamin M. Farley, Esq., about $227 of money remained in said Farley's hands, accruing from the sale of property assigned to him by Blood, and for which said Farley was accountable to Blood. Said Farley then assured Rebecca Blood, wife of said Henry Blood, that he would, so far as

he could, keep this money for her benefit and support, and she relied upon that assurance. Said Blood and his wife, subsequently, were both in the employ of said Farley, who, still retaining in his hands the aforesaid sum, became further indebted to said Blood; and in 1835, said Blood was desirous of purchasing a small place, called the Quaid place, in Hollis. Farley told him to purchase said place and he would see it paid for. Blood made a contract for the place, and Farley paid for it, and took a deed to himself. The sum paid exceeded the sum then in Farley's hands by about $124. Farley then told Blood he would give a bond, running to his (Blood's) wife, conditioned to convey said place to her, upon the payment of the one hundred and twenty-four dollars and a few cents, and the interest on it till paid; to which Blood assented. Accordingly, Farley executed a bond, dated May 15th, 1835, conditioned to convey the Quaid place to Rebecca Blood, the wife of Henry M. Blood, on being paid the one hundred and twenty-four dollars and a few cents, and the interest on it, and delivered the bond to Henry M. Blood. The object of this was to secure Mrs. Blood a home and a place to live on. About one year after this transaction, Henry M. Blood brought the bond to Farley, and paid him the amount mentioned in its condition, and the interest. Farley was then ready to make a conveyance, in accordance with the tenor of the bond; but Blood was desirous that the title should remain as it was, and Farley gave to him a memorandum, in writing, acknowledging the fulfilment of the condition of the bond, by the payment of the money, and saying he would convey the premises according to the tenor of the bond, when called on to do so, and said Henry M. Blood took said writing and retained the bond, his wife, Rebecca Blood, not being present, or giving any direction about it. And it does not appear that Mrs. Blood had the bond at any time. Subsequently, Blood talked of selling the Quaid place, and some other property which Farley had given him a bond to convey. His wife

was disturbed about it, and sent for Mr. Farley, and he called on her, and assured her no change should be made without her consent; that he (said Farley) had the control of it, and would keep it for her support, as he had at first assured her he would do. After seeing Blood, he assented to it, and it remained so. There was no agreement or understanding between said Blood and Farley, or between Farley and Blood and his wife, or any or either of them, that the property should be kept for any other purpose than the support and maintenance of Mrs. Blood during her life. The matter remained so, said Blood and his wife occupying the premises, and Blood paying the insurance upon them till the death of Mrs. Blood. Henry M. Blood has occupied them ever since, and now occupies them. After the decease of Mrs. Blood, Henry M. Blood took out a letter of administration on his deceased wife's estate, dated April 4, 1854, and in September, 1854, returned an inventory of her estate. Rebecca Blood died, never having had any issue.

On some occasions, Blood had been heard to say the Quaid place belonged to his wife, and that he would sell it, if it were not for his wife.

*A. W. Sawyer*, for Blood.

The decree should be in favor of Blood for the following reasons.

1. The bond was a chose in action, and it has been determined that, in equity, a husband may assign a chose in action which he has in right of his wife, and which he may recover or discharge. Dane's Ab. cap. 24, art. 24, § 6.

A husband may administer upon his deceased wife's estate, and that he is entitled for his own use to all her chattels real, things in action, trusts, and every other species of personal property, whether actually vested in her and reduced to possession or contingent or recoverable only by action; and in case the husband dies before he administers, the right to administer and to the property goes to the heirs

of the husband. *Judge of Probate* v. *Chamberlain*, 3 N. H. Rep. 130.

The husband takes the personal estate of his wife as administrator, without liability to account after debts paid; and whether he administers or not, and dies, and the wife's next of kin administer, such next of kin is a trustee for the personal representatives of the husband. 1 P. W. Rep. 381 ; 3 Atk. 526 ; 3 Ves. 247 ; 1 Wilson 168.

When a bond or other security is taken in the name of a married woman during coverture, the husband may elect to treat it as his own property. *Thompson* v. *Ellsworth*, 1 Barb. Ch. Rep. 624.

When a husband survives his wife, but dies without reducing her choses in action to possession, the same pass to the husband's personal representatives, and not to the wife's next of kin. *Lee* v. *Wheeler*, 4 Geo. 541; U. S. Dig. 1849, p. 264, § 8.

Husband and wife sell the equity of redemption in her property to a trustee, in trust to sell the same for the benefit of the grantors ; it was held that, after her death, the husband held it absolutely and against the heirs at law of the wife. *Siter* v. *Mc Clanachan*, 2 Gratt. 280 ; U. S. Dig. 1847, p. 298, § 21.

A husband who survives his wife is entitled to all her choses in action, whether reduced to possession in his life or not, and the administrator of his wife is trustee of the husband, and, after his death, of his personal representatives. *Whitaker* v. *Whitaker*, 6 Johns. 112. See also as to note payable to wife. 8 Mass. Rep. 229 ; 5 Shep. 301.

A husband may sue in his own right, after the death of his wife, for a legacy accruing to his wife during coverture. *Goddard* v. *Johnson*, 14 Pick. 352.

A husband and wife, seized in right of his wife of an estate of inheritance, leased the same, yielding and paying rent to the grantors and their heirs, &c.; upon the death of the wife, it was held that the husband was seized of the whole estate

created in fee by the deed.    *Robb* v. *Beam*, 8 Watts & Serg. 107 ; U. S. Dig. 167, § 12.

When the land of the wife was sold by the husband and wife, and a promissory note for the avails was taken in her name, and kept by her during her life, after which it was found in one of her drawers, and was inventoried by her husband as a part of her estate, it was held that such note, when made, became the property of the husband, and no agreement between them could be made, during coverture, which, in legal effect, would transfer, by way of gift or sale, the property in the note from the husband to the wife. 15 Conn. Rep. 587 ; 2 U. S. D. Sup. 120, §§ 55, 56.

Trusts in real property, which are exclusively cognizable in equity, are now, in many respects, governed by the same rules as the like estates are at law. 2 Story's Com. on Equity 236, § 974.

2.   It is an established doctrine, " where a man buys land in the name of another, and pays the consideration money, the land will generally be held by the grantee, in trust for the person who so paid the consideration money."

There are exceptions.

1.   A parent, purchasing in the name of a son, the purchase will be deemed, *prima facie*, intended as an advancement, so as to rebut the presumption of a resulting trust to the parent.

2.   A like presumption exists in case of a purchase by a husband in the name of his wife.   The same doctrine applies in the case of securities taken in the name of a child or wife.   2 Story's Com. on Equity 32, §§ 1201–1205.   But this presumption may be repelled by evidence.   2 Story on Equity 447, § 1204 ; 2 Madd. 101 ; *Baker* v. *Vining*, 17 Shep. 121.

3.   The evidence taken in this case repels the presumption that Blood intended to secure the Quaid place to his wife, or that he caused the bond to be given as an advance-

ment, or for a provision in the sense in which such words are used in law or equity.

4. Prior to the execution of this bond, there was a resulting trust raised between Farley and Blood, as to the Quaid place, because Blood had purchased it in the name of Farley, and paid a part of the consideration money. Did Blood, by assenting to the wishes of Mr. Farley, that this bond might be made to Blood's wife, intend it as and for an advancement to her,—a provision to her, technically speaking? Blood denies it in his answer, and the evidence shows he was, at most, willing said bond should be given, that his wife might have a support during life. Besides, nothing could pass by the bond, as there is no evidence it was ever delivered to Mrs. Blood, or that she ever had the possession of it. Now the giving of the bond, and the possession of it by Blood, might furnish evidence to Blood that Mr. Farley was not the absolute owner of the Quaid place, although the legal title was in him.

*B. F. Emerson*, for the heirs at law of Rebecca Blood.

1. It is contended that when the consideration money was all paid to Farley, according to the terms of the bond, the property in equity, vested in Mrs. Blood, and Farley became merely her trustee, and that the property descended, on her death, to her legal heirs, to the exclusion of her husband. 1 Fonblanque 414; 1 Dane 102, § 34; 242, § 2; 4 Dane 250, 291, § 9; 7 Dane 537, §§ 12, 13; 2 U. S. Equity Dig. 6, § 48; 5 § 42.

2. The wife cannot be a trustee for her husband, but if it be purchase land in her name, it will be deemed an advancement and provision for her. 2 Fonblanque 129.

3. A resulting trust will not arise to a person merely because he paid the purchase money, if it was not the intention of either party that the legal estate should vest in him. 1 Foster's Rep. 489; *Wallace* v. *Campbell*, 12 N. H. Rep. 362.

4. The estate being Mrs. Blood's in equity of Blood, as her administrator had obtained money or other property for it, such money or other property would have belonged to the legal heirs of Mrs. Blood. 2 U. S. Eq. Dig. 5, § 42; 6, § 48.

Woods, J. It appears from the master's report that the Quaid place was purchased by Mr. Farley, and paid for, in part, with the money of Blood in his hands at the time of the purchase. The residue was advanced at the request of Blood, by Mr. Farley, who took a conveyance to himself, and gave his bond to Rebecca Blood, with condition to convey it to her, upon Henry M. Blood's paying the amount which had been advanced, at his request, in the purchase. Blood paid the amount so advanced by Farley. The bond was, at the first, delivered to Blood and retained by him, and he claimed the right, after the payment to Farley, to sell the estate.

Upon this state of facts, it was agreed between Farley and Blood that the former should continue to hold the estate as he had done, for the benefit and support of Mrs. Blood, and to furnish her with a home during her life. This was done with the knowledge and assent of Mrs. Blood, and had from the beginning been the understanding of Blood and Farley, and the title to the estate has remained in Farley to the present time.

We regard the estate, under these circumstances, as holden in trust for Henry M. Blood, at least after the death of Mrs. Blood. If it might be regarded as intended as an advancement or provision for Mrs. Blood, upon the face of the transaction, yet that presumption is repelled by the facts of the case as found by the master, which go distinctly to the effect of disproving an intention to extend such provision beyond the term of her life.

If it be regarded as settled that land, purchased in the

name of a wife by the husband, be deemed *prima facie* as intended as an advancement or a provision for the wife, so as to rebut the presumption of a resulting trust to the husband, and if this case may be considered as standing on that footing, still such intendment may be rebutted or repelled by evidence.

The evidence, in this case, fully repels the idea that Blood intended that this estate should be secured to his wife, or held in trust for her, beyond the use of it for her support during her life, or that the bond was made running to her, for any other purpose than to secure that precise object.

At her death, then, all right in her to the estate or bond ceased. We regard Blood, therefore, as being entitled to a conveyance from Farley of the premises in question.

Let his deed, therefore, of the Quaid place to Blood, made and deposited with the clerk, in pursuance of a former decree, be delivered to Blood, and the deeds to the heirs at law be returned to the complainant.

---

After the opinion in this case was announced in favor of the validity of the claim of Blood to the estate in question, as between him and the heirs of Mrs. Blood, a motion was made by Farley for costs of the suit of interpleader to be adjudged to him; and a motion was made by Henry M. Blood for a decree for costs.

WOODS, J. Upon the authorities, the question of costs is one of easy solution, and the principles governing it of ready and familiar application. If the plaintiff conduct himself properly, his costs will uniformly be allowed him, either out of the funds in his hands, when there are any such which

can be made available, or against some of the parties made defendants in the bill.

And in reference to the question who among the defendants shall pay, the rule is that the defendant who improperly raises the double claim, making the bill of interpleader necessary, shall pay the costs of the plaintiff and of the defendant who is the successful party. Beams on Costs 37, § 6; *Mortimies* v. *Helmath,* 2 Ves. & Bea. (2d ed.) 412; *Dawson* v. *Hardcastle,* 2 Cox 278; *Edenson* v. *Roberts,* 2 Cox 280; *Hodges* v. *Smith,* 1 Cox 357; *Fairbrother* v. *Prattent,* 5 Price 303; *Aldridge* v. *Thompson,* 2 Bro. C. C. 149; *Cowtan* v. *Williams,* 9 Ves. 107; *Aldridge* v. *Mesner,* 6 Ves. 418. In the last cited case it was said that " if there was no fund in court costs would be given against the party who occasioned " the suit. And if the plaintiff improperly conduct himself, he will not be entitled to his costs. *Brymer* v. *Buchanan,* 1 Cox 425, note.

In *Paris* v. *Gilham,* Cooper 56, it is holden that the plaintiff has a lien upon the fund, if the suit is properly instituted. And when the right to compel the defendants to interplead is not disputed, the plaintiff may obtain his costs on motion. *Jones* v. *Gilham,* Cooper 49. When the right is disputed, costs will not be given to the plaintiff before the hearing. *Jones* v. *Gilham,* ub. sup.

In Seaton's Forms of Decrees in Equity 341, note 3, it is said that the court will order the defendants, by whom the suit has been occasioned, to pay the costs of the plaintiff and of the other defendants. And *Dawson* v. *Hardcastle,* 2 Cox 278, and *Cowan* v. *Williams,* 9 Ves. 108, are referred to in support of the doctrine.

On the whole, we are of the opinion that Farley is entitled to his costs up to the time of the decree made ordering the defendants to interplead, and sending the case to the master, against the heirs of Mrs. Blood; and that the other defendant, Henry M. Blood, is entitled to his costs also against said heirs.

The heirs are to be regarded as the persons who occasioned the suit, and according to the whole current of the authorities, are bound to pay the costs of all the other parties.

A decree must, therefore, be entered accordingly.